IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Edward W. Nottingham**

Civil Action No. 06–cv–00714–EWN–PAC

JOAN BACA,

      Plaintiff,

v.

GARY M. CLARK, d/b/a DEPOT SALES, d/b/a SCAFFOLDING DEPOT, d/b/a DEPOT
SALES, LLC and
ACTION SCAFFOLDING, INC., d/b/a ACTION SCAFFOLDING MANUFACTURING,

      Defendants.

---

## ORDER AND MEMORANDUM OF DECISION

---

      This is a personal injury case.  Plaintiff Joan Baca asserts eight state law claims against

Defendants Gary M. Clark ("Defendant Clark") and Action Scaffolding, Inc. ("Defendant

Action") based upon injuries she sustained when she fell from a ladder placed against scaffolding

she purchased from Defendants.  This matter is before the court on three motions, all filed

December 18, 2006: (1) "Action's Motion for Summary Judgment Against Plaintiff;" (2)

"Action's Motion for Summary Judgment Against Clark and Depot Sales;" and (3) "Plaintiff's

Request for a *Daubert* Hearing Regarding Certain Opinions Expressed by Defense Experts James

P. Kelly, M.D. and Kevin J. Reilly, Psy.D."  Jurisdiction is premised upon 28 U.S.C.A. § 1332

(West 2007), diversity of citizenship.

# FACTS

## 1. Procedural History

On February 8, 2006, Plaintiff filed her complaint in state court.  (Notice of Removal, Ex. 2 [Compl.] [filed Apr. 17, 2006].)  On April 17, 2006, Defendant Action removed the case to this court.  (*Id.* at 1.)  On May 12, 2006, Plaintiff filed an amended complaint, asserting the following claims: (1) strict liability for defective manufacture against Defendant Action; (2) "successor corporation" against Defendant Clark; (3) failure to warn and instruct against both Defendants; (4) breach of implied warranty of merchantability against both Defendants; (5) negligence against Defendant Action; (6) negligent failure to warn against both Defendants; (7) misrepresentation against Defendant Clark; (8) "joint venture" against both Defendants; and (9) violation of the Colorado Consumer Protection Act ("CCPA") against both Defendants.  (Am. Compl. and Jury Demand [filed May 12, 2006] [hereinafter "Am. Compl."].)  On June 26, 2006, Defendant Action filed its answer.  (Answer to Am. Compl. [filed June 26, 2006].)  On July 26, 2006, then-Defendant Depot Sales, LLC filed its answer.[1]  (Answer of Depot Sales, LLC, [sic] to Am. Compl. [July 26, 2006].)  On August 11, 2006, Defendant Clark filed his answer.  (Answer of Gary Clark to Am. Compl. [filed Aug. 11, 2006].)  On October 25, 2006, the court granted a motion by Plaintiff to dismiss her "joint venture" claim.  (Order of Dismissal of Joint Venture Claim with Prejudice [filed Oct. 25, 2006].)

---

[1]On March 30, 2007, I granted Plaintiff's motion to consolidate Defendant Depot Sales, LLC and Defendant Clark based on my finding that Defendant Depot Sales, LLC was a "mere continuation" of a sole proprietorship, Depot Sales, run by Defendant Clark.  (Order [filed Mar. 30, 2007].)

On November 14, 2006, Defendant Clark and then-Defendant Depot Sales, LLC asserted cross claims for promissory estoppel and negligent misrepresentation against Defendant Action, based on the contention that Defendant Action had represented to Defendant Clark that its insurance extended to items he sold.  (Cross Cl. of Def. Gary Clark Against Action Scaffolding, Inc., [sic] [filed Nov. 14, 2006]; Cross Cl. of Def. Depot Sales, LLC, [sic] Against Action Scaffolding, Inc., [sic] [filed Nov. 14, 2006].)  On November 21, 2006, Defendant Action filed answers to the cross claims.  (Answer to Cross Cl. of Depot Sales [filed Nov. 21, 2006]; Answer to Cross Cl. of Gary Clark [filed Nov. 21, 2006].)

On December 18, 2006, Defendant Action filed its motion for partial summary judgment against Plaintiff, arguing that: (1) Plaintiff failed to read the indisputably adequate warnings Defendant Action provided to her; and (2) Defendant Action cannot be held liable under the CCPA because it was not involved in Plaintiff's purchase of the scaffolding at issue.  (Action's Mem. Br. in Supp. of Mot. for Summ. J. Against Pl. [filed Dec. 18, 2006] [hereinafter "Def. Action's S.J. Br."].)  On January 8, 2007, Plaintiff filed her response brief.  (Pl.'s Mem. Br. in Resp. to Def. Action's Mot. for Summ. J. [filed Jan. 8, 2007] [hereinafter "Pl.'s S.J. Resp."].)  On January 26, 2007, Defendant filed its reply brief. (Action's Reply Br. in Supp. of Mot. for Summ. J. Against Pl. [filed Jan. 26, 2007] [hereinafter "Def. Action's S.J. Reply"].)

Also on December 18, 2006, Defendant Action filed its motion for summary judgment on Defendant Clark's cross claims, arguing that Defendant Clark's: (1) negligent misrepresentation claim is barred by the economic loss rule; and (2) promissory estoppel claim suffers multiple evidentiary and legal deficiencies.  (Action's Mem. Br. in Supp. of Mot. for Summ. J. Against

Clark and Depot Sales [filed Dec. 18, 2006] [hereinafter "Def. Action's Cross Cl. Br."].)  On

January 8, 2007, Defendant Clark filed his response brief.  (Mem. of Law in Supp. of Resp. by

Gary Clark and Depot Sales, LLC, [sic] to Action Scaffolding's Mot. for Summ. J. [filed Jan. 8,

2007] [hereinafter "Def. Clark's Cross Cl. Resp."].)  On January 26, 2007, Defendant Action filed

its reply.  (Action's Reply in Supp. of Mot. for Summ. J. Against Clark and Depot Sales [filed

Jan. 26, 2007] [hereinafter "Def. Action's Cross Cl. Reply"].)

       Also on December 18, 2006, Plaintiff moved for a *Daubert* hearing regarding the

testimony of two expert witnesses retained by Defendant Action.  (Pl.'s Request for a *Daubert*

Hr'g Regarding Certain Opinions Expressed by Defense Experts James P. Kelly, M.D. and Kevin

J. Reilly, Psy.D. [filed Dec. 18, 2006] [hereinafter "Pl.'s Br."].)  On December 19, 2006, this

court issued an order stating its preference that:

> *Daubert* issues be raised, if necessary, in connection with the motions for summary
> judgment which have been filed.  Plaintiff's motion will therefore be construed as a
> motion to strike the allegedly inadmissible parts of any expert opinions which
> support the defense motions.  The parties should brief the motion to strike as part
> of the summary judgment briefing.

(Order [filed Dec. 19, 2006].)  On January 10, 2007, Defendant Action filed its response.

(Action's Resp. to Pl.'s Request for a *Daubert* Hr'g [filed Jan. 10, 2007] [hereinafter "Def.

Action's Resp."].)  On January 25, 2007, Plaintiff filed her reply brief.  (Pl.'s Reply in Supp. of

Her Request for a *Daubert* Hr'g Regarding Certain Opinions Expressed by Defense Experts

James P. Kelly, M.D. and Kevin J. Reilly, Psy.D. [filed Jan. 25, 2007] [hereinafter "Pl.'s Reply"].)

## 2.      Factual Background

### a.      Facts Pertaining to Defendant Action's Motion for Partial Summary Judgment on Plaintiff's Failure to Warn and CCPA Claims

On October 22, 2003, Plaintiff called Defendant Clark to order scaffolding equipment to be delivered to her home.  (Def. Action's S.J. Br., Statement of Undisputed Material Facts [hereinafter "SOF"] ¶¶ 1–3; *admitted at* Pl.'s S.J. Resp., Resp. to Statement of Undisputed Material Facts [hereinafter "Resp. to SOF"] ¶¶ 1–3.)  When Plaintiff purchased scaffolding from Defendant Clark, she did not know Defendant Action was the manufacturer and, indeed, had never even heard of the company.  (*Id.*, SOF ¶¶ 4–5; *admitted at* Pl.'s S.J. Resp., Resp. to SOF ¶¶ 4–5.)  No employee of Defendant Action spoke with Plaintiff in the course of the purchase.  (*Id.*, SOF ¶ 6; *admitted at* Pl.'s S.J. Resp., Resp. to SOF ¶ 6.)

After Plaintiff placed her order, Defendant Clark purchased scaffolding from Defendant Action and instructed the company to ship the scaffolding directly to Plaintiff.  (*Id.*, SOF ¶ 7; *admitted at* Pl.'s S.J. Resp., Resp. to SOF ¶ 7.)  The scaffolding arrived with a copy of the Code of Safe Practices for Frame Scaffolds ("Code"), which provided various warnings about the safe use of scaffolding.  (*Id.*, SOF ¶¶ 10–14; *admitted in relevant at* Pl.'s S.J. Resp., Resp. to SOF ¶¶ 10–14.)  Although Plaintiff recalls receiving the Code and placing it in her files, she did not read it.  (*Id.*, Ex A–1 at 88 [Baca Dep.].)  The scaffolding frames Plaintiff received had written warning labels affixed to them, which Plaintiff noticed but did not read.  (*Id.*, SOF ¶ 15; *admitted at* Pl.'s S.J. Resp., Resp. to SOF ¶ 15.)

**b.**     *Facts Pertaining to Defendant Action's Motion for Summary Judgment on Defendant Clark's Cross Claims*

Based on a telephone conversation with Defendant Action's employee, Jeff Younger, Defendant Clark believed that Defendant Action's insurance would cover claims brought against him by scaffolding purchasers.  (Def. Action's Cross Cl. Br., Statement of Undisputed Material Facts [hereinafter "SOF"] ¶ 4; *admitted in relevant part at* Def. Clark's Cross Cl. Resp., Resp. to Statement of Undisputed Material Facts [hereinafter "Resp. to SOF"].)[2]  Defendant Clark does not recall when this conversation occurred, nor is there any written confirmation of the conversation.  (*Id.*, SOF ¶ 5; *admitted at* Def. Clark's Cross Cl. Resp., Resp. to SOF.)  Defendant Clark believed this conversation constituted an agreement with Defendant Action that would apply to all future sales of Defendant Action's scaffolding.  (*Id.*, SOF ¶ 6; *admitted at* Def. Clark's Cross Cl. Resp., Resp. to SOF.)

_____

[2]Defendant Clark's brief totally disregards my procedural rules.  Instead of admitting or denying Defendant Action's statement of facts "in separate paragraphs numbered to correspond to [Defendant Action's] paragraph numbering," Defendant Clark merely states that he "agree[s] with almost all of the undisputed material facts with the exception of [two statements]."  (Def. Clark's Cross Cl. Resp. at 3; Practice Standards — Civil: Special Instructions Concerning Motions for Summary Judgment ¶ 4.)  More egregiously, Defendant Clark's denials are not accompanied by any reference whatsoever "to material in the record supporting the denial."  (*Id.* ¶ 4.)  If evidence giving rise to genuine issues of material fact is in the record, it is Defendant Clark's responsibility to bring such evidence to the court's attention.  *See United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) (stating "[j]udges are not like pigs, hunting for truffles buried in" the record).

# ANALYSIS

### 1.    *Motions for Summary Judgment*

### a.    *Legal Standard*

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, the court may grant

summary judgment where "the pleadings, depositions, answers to interrogatories, and admissions

on file, together with the affidavits, if any, show that there is no genuine issue as to any material

fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)

(2007); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986); *Concrete Works, Inc.*

*v. City & County of Denver*, 36 F.3d 1513, 1517 (10th Cir. 1994).  The moving party bears the

initial burden of showing an absence of evidence to support the nonmoving party's case.  *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  "Once the moving party meets this burden, the

burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material

matter."  *Concrete Works*, 36 F.3d at 1518 (citing *Celotex*, 477 U.S. at 325).  The nonmoving

party may not rest solely on the allegations in the pleadings, but must instead designate "specific

facts showing that there is a genuine issue for trial."  *Celotex*, 477 U.S. at 324; *see* Fed. R. Civ. P.

56(e) (2007).  A fact in dispute is "material" if it might affect the outcome of the suit under the

governing law; the dispute is "genuine" if the evidence is such that it might lead a reasonable jury

to return a verdict for the nonmoving party.  *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir.

1997) (citing *Anderson*, 477 U.S. at 248).  The court may consider only admissible evidence when

ruling on a summary judgment motion.  *See World of Sleep, Inc. v. La-Z-Boy Chair Co.*, 756 F.2d

1467, 1474 (10th Cir. 1985).  The factual record and reasonable inferences therefrom are viewed

in the light most favorable to the party opposing summary judgment.  *Byers v. City of Albuquerque*, 150 F.3d 1271, 1274 (10th Cir. 1998) (citing *Concrete Works*, 36 F.3d at 1517).

> **b.   Evaluation: Defendant Action's Motion for Partial Summary Judgment on Plaintiff's Failure to Warn and CCPA Claims**
>
> **(1)   Failure to Warn Claims**

Plaintiff has asserted two failure to warn claims, one based on a strict liability theory and another based on a negligence theory.  (Am. Compl.)  In its motion for summary judgment, Defendant Action asserts it furnished adequate warnings and further argues: "Plaintiff cannot in good faith argue that additional warnings would have prevented this accident as she admitted that she read neither the Code . . . nor the warning labels affixed to the scaffold frames."  (Def. Action's S.J. Br. at 12.)  In response, Plaintiff contends that "[h]ad [she] been furnished with adequate instructions and warnings, she would have read them and perhaps her injury would have been prevented."  (Pl.'s S.J. Resp. at 11.)

As a preliminary matter, the court notes that because Plaintiff in this diversity case is a Colorado resident whose injury occurred in Colorado, Colorado law governs her claims.  *See Erie R.R. v. Tompkins*, 304 U.S. 64 (1938).  The court thus turns to outline Colorado law regarding claims for failure to warn brought under negligence and strict liability theories.

The elements of negligence are: (1) the existence of a legal duty owed by the defendant to the plaintiff; (2) breach of that duty; and (3) a sufficient causal relationship between the defendant's breach and the plaintiff's injuries.  *Martinez v. Lewis*, 969 P.2d 213, 217 (Colo. 1998).  "When a manufacturer or seller knows or should know of unreasonable dangers

associated with the use of its product [that are] not obvious to product users, it has a duty to warn of these dangers; and a breach of this duty constitutes negligence." *Palmer v. A.H. Robins Co.*, 684 P.2d 187, 198 (Colo. 1984).

The elements of a strict liability design defect claim are: (1) the product is in a defective condition unreasonably dangerous to the user or consumer; (2) the product is expected to and does reach the consumer without substantial change in the condition in which it was sold; (3) the design defect caused the plaintiff's injury; (4) the defendant sold the product and is engaged in the business of selling products; and (5) the plaintiff sustained damages. *Barton v. Adams Rental*, 938 P.2d 532, 536–37 (Colo. 1997). A manufacturer's failure to provide adequate warnings for a product may render said product defective and unreasonably dangerous. *Anderson v. M.W. Kellogg Co.*, 766 P.2d 637, 643 (Colo. 1988).

In *Romero v. International Harvester Co.*, the Tenth Circuit concluded "that there need not be a rigid distinction between negligence and strict liability failure to warn concepts." 979 F.2d 1444, 1452 (10th Cir. 1992) (citing *Downing v. Overhead Door Corp.*, 707 P.2d 1027, 1032 [Colo. Ct. App. 1985]; *Halliburton v. Pub. Serv. Co.*, 804 P.2d 213, 217 [Colo. Ct. App. 1990]). This is particularly so in cases where the same undisputed evidence defeats an essential element common to both claims: causation. *See Staley v. Bridgestone/Firestone, Inc.*, 106 F.3d 1504, 1509 (10th Cir. 1997) (noting the absence of a showing "that the lack of the warning caused the accident" supported judgment as a matter of law). For the reasons set forth below, the court finds that Plaintiff neglected to demonstrate her injuries to be causally connected to any alleged failure to warn. This misstep is fatal to both failure to warn claims.

In her deposition, Plaintiff testified as follows:

Q:    [D]id [the Code] accompany the scaffolding shipment?
A:    Yes.
Q:    Where was it?
A:    It was folded up in eighths, I think in a plastic envelope that was attached
      someplace on the shipment.
*      *      *
Q:    What did you do with the [C]ode . . . after you received it?
A:    Put it in my notes . . . .  And I probably put it in a pile with my other
      paperwork.
*      *      *
Q:    [D]id you read the [C]ode . . . ?
A:    *No, I did not.*
Q:    Did you give it to your husband to read?
A:    No, I did not.
Q:    Why not?
A:    I thought it was a busy piece of paperwork and didn't feel it was relative
      [sic] to anything.  It didn't say ["]instructions["] on it, so therefore, I
      thought it was just something that came with it.
Q:    Was there any written material on the scaffold frames that you received?
A:    What do you mean by written material?
Q:    Labels.
A:    I think I recall something, that squiggly line.  I can't — it's not squiggly,
      it's a series of straight lines that represent the visual [sic] hazard of
      electrocution, I think.  That's all I recall.
Q:    Let me hand you [a warning label identical to the ones on your
      scaffolding].  Was there a label such as this on the scaffold frames that you
      received?
A:    I can't tell you.
Q:    Did you read any of the materials that were on the scaffold frames that you
      received?
A:    Actually, I thought that there was only the thing about the electrocution.
Q:    Did you read that, the thing about electrocution?
A:    *I didn't read it.*  I recall looking at it.  I think maybe when I was standing
      on the ladder and I had nothing to do, I looked at it.

(Def. Action's S.J. Br., Ex. A–1 at 86–89 [Baca Dep.] [emphases added].)  Nothing on the

warning label affixed to the scaffolding pertains to the dangers of electrocution.  (*See id.*, Ex. A–4

[Warning Label], Ex. A–2 ¶ 7 [certifying that Exhibit A–4 is a true and correct copy of the label attached to the frames sold to Plaintiff].)

Thus, the undisputed evidence reveals that Plaintiff considered warnings to be either "busy paperwork" or "thing[s]" unworthy of anything more than an idle glance.  (*See id.*, Ex. A–1 at 86–89 [Baca Dep.].)  Had Plaintiff read the warning labels affixed to her scaffolding, she would have noted that they referred her to the safety guidelines contained in the Code.  (*See id.*, Ex. A–4 [Warning Label].)  Had she read the Code, Plaintiff would have happened upon, *inter alia*, sets of instructions and warnings specifically concerning the "SAFE USE OF SCAFFOLDING" as well as "ADDITIONAL GUIDELINES" for "ROLLING SCAFFOLDS," such as the particular scaffolding that she had purchased.  (*Id.*, Ex. A–3 [Code].)

Plaintiff puts great emphasis on the fact that the scaffolding did not arrive with instructions for its proper erection, noting that she had to call Defendant Action to request "instructions on erecting the scaffolding" and asserting that the Code "is not a substitute for instructions."  (Pl.'s S.J. Resp. at 14–15.)  It is beyond dispute, however, that the Code speaks to the dangers of the use of scaffolding — and it is also undisputed that Plaintiff received the Code and saw the warning labels, but read neither.  (Def. Action's S.J. Br., SOF ¶¶ 7, 15; *admitted at* Pl.'s S.J. Resp., Resp. to SOF ¶¶ 7, 15; *id.*, Ex. A–1 at 86–89 [Baca Dep.].)  Plaintiff's self-serving, conclusory assertion that had she "been furnished with adequate instructions, she would have read them" is insufficient to overcome her admission that she did not read the warnings she received. *See Annett v. Univ. of Kan.*, 371 F.3d 1233, 1237 (10th Cir. 2004) (stating "unsupported conclusory allegations . . . do not create a genuine issue of fact" on summary judgment); *Zampos*

-11-

*v. U.S. Smelting, Refining & Mining Co.*, 206 F.2d 171, 173–74 (10th Cir. 1953) ("[F]limsy allegations which are transparently not well founded fact are insufficient to state a justiciable controversy requiring the submission thereof for trial."). Plaintiff's failure to read either set of warnings reveals a causal disconnect between her allegations of the Code's and labeling's inadequacy and the occurrence of her injury. *See Staley*, 106 F.3d at 1509. Based on the foregoing, I find that the absence of evidence suggesting Plaintiff's injury was causally connected to a failure to warn warrants dismissal of Plaintiff's claim.

### (2) CCPA Claim

Defendant Action argues that there is no evidence that it did anything misleading to induce Plaintiff to purchase the subject scaffolding in violation of the CCPA. (Def. Action's S.J. Br. at 13–15.) In response, Plaintiff argues that because the pictures of products on Defendant Action's website are identical to those Plaintiff saw on Defendant Clark's website when she was researching her scaffolding purchase, "it was the pictures of [Defendant] Action's scaffolding that enticed [her] to purchase from [Defendant Clark]" and, consequently, Defendant Action should be held liable.[3] (Pl.'s S.J. Resp. at 17.) In its reply brief, Defendant Action notes that Plaintiff failed to certify that the exhibits she asserts to be reproductions of each Defendant's respective website are indeed what she claims them to be. (Def. Action's S.J. Reply at 13 & n.3.) Thus, Defendant Action argues that this total absence of competent evidence requires dismissal of Plaintiff's CCPA claim. (*Id.*) I agree.

---

[3]No kidding. This really is Plaintiff's argument.

Federal Rule of Civil Procedure 56(e) provides:

Supporting and opposing affidavits shall be made on personal knowledge, shall set
forth such facts as would be admissible in evidence, and shall show affirmatively
that the affiant is competent to testify to the matters stated therein.  Sworn or
certified copies of all papers or parts thereof referred to in an affidavit shall be
attached thereto or served therewith.

Fed. R. Civ. P. 56(e) (2007).  Other than making conclusory statements asserting that Exhibits

Six, Seven, and Eight to her brief respectively represent pictures from Defendant Clark's website

in 2003, Defendant Clark's current website, and Defendant Action's current website, Plaintiff

neglects to furnish any foundation that would suggest that the exhibits really are what she claims

them to be.  (*See* Pl.'s S.J. Resp.)  "It is well established that unsworn, unauthenticated

documents cannot be considered on a motion for summary judgment."  *Orsi v. Kirkwood*, 999

F.2d 86, 92 (4th Cir. 1993); *see* 10A WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE §

2722 (3d ed. 1998) ("To be admissible, documents must be attached to an affidavit that meets the

requirements of Rule 56(e) and the affiant must be a person through whom the exhibits could be

admitted into evidence.").  Plaintiff's failure to authenticate the exhibits by affidavit, as called for

in Rule 56(e), is fatal.  *See Boilermaker-Blacksmith Nat'l Pension Fund v. Gendron*, 96 F. Supp.

2d 1202, 1205 n.2 (D. Kan. 2000); *Rill v. Trautman*, 950 F. Supp. 268, 269 (E.D. Mo. 1996);

*Nolla Morell v. Riefkohl*, 651 F. Supp. 134, 136 (D.P.R. 1986).

Even had Plaintiff properly authenticated the exhibits, they fail to demonstrate any issue of

fact exists that would preclude entry of summary judgment on her CCPA claim.  Recall that the

basis of her claim is "the pictures of equipment [on Defendant Clark's website] are exact [sic] the

same" as those on Defendant Action's website.  (Pl.'s S.J. Resp. at 17.)  Colorado Revised

-13-

Statutes section 6–1–105(1)(u) provides that it is a deceptive trade practice to "[f]ail[] to disclose material information concerning goods, services, or property which information was known at the time of an advertisement or sale if such failure to disclose such information was intended to induce the consumer to enter into a transaction." Colo. Rev. Stat. § 6–1–105(1)(u) (2006). Plaintiff does not argue that the relevant pictures inaccurately depicted Defendant Action's scaffolding products. Instead, Plaintiff appears to be arguing that by creating and disseminating pictures of its scaffolding products, Defendant Action somehow withheld key information in an effort to induce unwitting consumers into purchasing said products. (*See* Pl.'s S.J. Resp. at 17.) Undoubtedly, Plaintiff fails to enunciate this argument with any degree of precision because even she recognizes it to be preposterous. A picture may be worth a thousand words, but nothing in the CCPA suggests that mere dissemination of pictures of one's products presents a danger to consumers.

Additionally, Plaintiff's argument attempts to whitewash an absence of evidence of any *meaningful* failure to communicate material information on the part of Defendant Action. Indeed, Plaintiff's own allegations reveal that Defendant Action did not communicate with her — either directly or through advertisements — prior to her decision to purchase scaffolding from Defendant Clark. (*See* Pl.'s S.J. Resp., Ex. 4 at 31–32 [Baca Dep.], Ex. 3 ¶ 5 [Baca Aff.].) Absent such communication, it is difficult to see how Defendant Action might have employed a deceptive trade practice. For Plaintiff's edification, the court will boil the relevant CCPA provision down to a "Johnny Cochranism:"

-14-

**NO COMMUNICATION, NO MISREPRESENTATION.**

*See* Colo. Rev. Stat. § 6–1–105(1)(u) (2006).  Defendant Action is entitled to summary judgment

on Plaintiff's specious CCPA claim.

>    **b.     *Evaluation: Defendant Action's Motion for Summary Judgment on Defendant
>             Clark's Cross Claims***

Defendant Clark concedes his negligent misrepresentation claim.  (Def. Clark's Cross Cl.

Resp. at 4.)  Accordingly, this court gives it no further consideration.

With respect to Defendant Clark's promissory estoppel claim, Defendant Action argues,

*inter alia*, that: (1) the claim arises out of contract and is barred by the statute of frauds; (2) the

record is devoid of evidence of any definitive terms agreed upon between the parties; (3)

Defendant Clark sets forth no competent evidence that he changed his position in reliance on the

alleged promise of insurance; and (4) if he did rely on a representation, such reliance was

unreasonable.  (Def. Action's Cross Cl. Br.; *see* Def. Action's Cross Cl. Reply.)  I need only

consider a handful of Defendant Action's arguments.

Defendant Clark's utter failure to marshal any factual evidence in support of his

promissory estoppel claim is fatal.  (*See* Def. Clark's Cross Cl. Resp., *passim.*)  It is a

fundamental principle that Defendant Clark may not rest solely on the allegations in the pleadings,

but must instead designate "*specific facts showing that there is a genuine issue for trial.*"

*Celotex*, 477 U.S. at 324 (emphasis added).  Instead of satisfying this burden, Defendant Clark

offers only conclusory allegations wholly unsupported by any evidence whatsoever.  Indeed, the

closest thing to a citation to competent evidence that Defendant Clark offers is his statement that

"in responding to [Defendant Action's] Motion for Summary Judgment, Defendant[]

Clark . . . rel[ies] on the exhibits attached to [Defendant Action's] Motion for Summary

Judgment." (Def. Clark's Cross Cl. Resp. at 3 n.1.)  This paltry effort is insufficient to overcome

Defendant Action's well-supported argument that no genuine issue of fact exists.

        Even if Defendant Clark had bothered to substantiate his factual assertions with competent

evidence, those assertions would still suggest that summary judgment is appropriate.  Under

Colorado law,[4] the elements of a promissory estoppel claim are: (1) the promisor made a promise

to the promisee; (2) the promisor should reasonably have expected that promise would induce

action or forbearance by the promisee; (3) the promisee in fact reasonably relied on the promise to

the promisee's detriment; and (4) the promise must be enforced to prevent injustice.  *Berg v. State*

*Bd. of Agric.*, 919 P.2d 254, 259 (Colo. 1996).  As set forth below, Defendant Clark's assertions

fail to satisfy the third and forth elements of promissory estoppel.

        With respect to the third element, Defendant Clark never suggests a basis for his apparent

belief that Mr. Younger — who the record indicates was a salesman — was authorized to bind

Defendant Action with a promise to insure Defendant Clark.  (*See* Def. Clark's Cross Cl. Resp.)

Defendant Clark only digs himself in deeper when he argues that he was:

> an inexperienced businessman asking a large manufacturing concern with multiple
> locations about whether [Defendant] Clark should get insurance, [so] his reliance
> was definitely reasonable.  Especially in light of the fact that other vendors selling

---

        [4]The parties agree that Colorado law governs this cross claim, so the court assumes
without deciding that it indeed does.  (*See* Def. Action's Cross Cl. Br. at 9; Def. Clark's Cross Cl.
Resp. at 5–15.)

> to [Defendant] Clark or Depot Sales have issued certificates of insurance to them
> listing Depot Sales as an additional insured on the vendor's liability insurance.

(*Id.* at 12.)  In one breath Defendant Clark purports to be an "inexperienced businessman," but in

the next he admits that other scaffolding vendors had issued certificates of insurance naming his

business as an additional insured.   Nowhere does Defendant Clark allege that he requested — let

alone received — such a certificate from Defendant Action.  (*See id.*)  Thus, I find that Defendant

Clark's alleged decision to rely on the oral representations of a salesperson regarding an unwritten

contract for insurance was, to say the least, unreasonable.   Further, with respect to the fourth

element of promissory estoppel, I find that no injustice will result from forcing Defendant Clark to

face the consequences of his lax approach to running a business.   Summary judgment is therefore

warranted.

### 3.    *Request for* **Daubert** *Hearing*

#### a.    *Legal Standard*

Federal Rule of Evidence 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to
> understand the evidence or to determine a fact in issue, a witness qualified as an
> expert by knowledge, skill, experience, training, or education, may testify thereto
> in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient
> facts or data, (2) the testimony is the product of reliable principles and methods,
> and (3) the witness has applied the principles and methods reliably to the facts of
> the case.

Fed. R. Evid. 702 (2007).  Under this rule, the district court thus acts as an evidentiary

"gatekeeper" to determine whether an expert's proffered testimony pertaining to scientific

knowledge is reliable and relevant.  *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589

(1993); *Black v. M & W Gear Co.*, 269 F.3d 1220, 1237 (10th Cir. 2001). A court determines reliability by assessing "whether the reasoning or methodology underlying the testimony is scientifically valid." *Daubert*, 509 U.S. at 589.

Expert testimony, however, carries with it a danger that the jury will give it disproportionately large weight, due in part to the difficulty of evaluating expert opinions. *Id.* at 595. Fundamentally, then, the purpose of the *Daubert* inquiry is to assure that a trial expert adheres to "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999). However, the court need not determine that the expert evidence is correct or irrefutable in order to admit it. *Mitchell v. Gencorp Inc.*, 165 F.3d 778, 781 (10th Cir. 1999).

*Daubert* provides several non-exhaustive factors for district courts to consider in assessing whether scientific evidence is reliable: (1) whether the technique can be and has been tested; (2) whether the technique has been subjected to peer review; (3) the known potential error rate of the technique; (4) the existence and maintenance of standards controlling the technique's operation; and (5) whether the technique has gained general acceptance in the scientific community. *Daubert*, 509 U.S. at 593–95; *Mitchell*, 165 F.3d at 780. These factors do not represent "a definitive checklist or test." *Daubert*, 509 U.S. at 593–94. Rather, "the inquiry envisioned by Rule 702 is . . . a flexible one." *Id.* The specific factors considered in deciding whether evidence is admissible will vary depending on the specific nature of the testimony to be presented in a particular case. *Kumho Tire Co.*, 526 U.S. at 150.

Generally, the court should focus on the experts' methodology rather than the conclusions that they generate. *See Daubert*, 509 U.S. at 595; *Hollander v. Sandoz Pharms. Corp.*, 289 F.3d 1193, 1205 (10th Cir. 2002). A court may conclude, however, that "there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. v. Joiner*, 522 U.S. 136, 147 (1997).

Notably, while a party may request a *Daubert* hearing, it is within the district court's discretion to determine whether a hearing is necessary. *See United States v. Charley*, 189 F.3d 1251, 1266 (10th Cir. 1999) (stating district court is granted great latitude in "deciding whether to hold a formal hearing"); *accord Goebel v. Denver & Rio Grande W. R.R.*, 215 F.3d 1083, 1087 (10th Cir. 2000).

### b. Evaluation

Plaintiff requests a *Daubert* hearing and asserts that two of Defendant Action's experts, James P. Kelly, M.D. and Kevin. J. Reilly, Psy.D., expressed opinions that fall short of Rule 702's requirements. I consider the parties' arguments with respect to each expert in turn. The ensuing discussion reveals that no hearing is necessary.

### (1) Dr. Kelly

Plaintiff attacks the expert testimony of Dr. Kelly, Defendant's endorsed neurologist, on two grounds. I consider each line of argument in turn.

A. CONCUSSION TESTING — First, Plaintiff asserts that Dr. Kelly's testimony lacks merit, because although Dr. Kelly did not assess Plaintiff until two years after her fall, the doctor nevertheless "based his opinion *in part* on [the Standardized Assessment of Concussion ("SAC")]

which, in terms of peer-reviewed scientific literature, is used at the time of the injury through

[ninety] days post-injury." (Pl.'s Br. at 4–6 [emphasis added].) In response, Defendant contends

that Dr. Kelly relied upon much more than the SAC in forming his opinions, noting that Dr. Kelly

also relied on "a CT scan of the head, a MRI scan of the brain, Plaintiff's academic records,

deposition testimony, and other materials, and conducted his own thorough physical examination

and neurological interview and examination of Plaintiff." (Def. Action's Resp. at 3–5.)

In Dr. Kelly's deposition, the following exchange took place:

Q: Is [the SAC] a test that you developed?
A: Yes.
Q: When did you develop it?
A: In the mid-1990s, and it was published in 1997 for the first time. . . .
*       *       *
Q: And you have not performed any studies in which you have used [the] SAC to assess whether someone has mild traumatic brain injury some two years and four months out from the injury, have you?
A: We have not published any, but I have been using it in that fashion for several years since it was published almost [ten] years now.
Q: But you have not published and had subjected to peer-review results of using this test . . . two years four months out from the injury, correct?
A: That's correct.

(Pl.'s Br., Ex. 2 at 52–54 [Kelly Dep.].) It is true that whether a technique has been subjected to

peer review is one factor in list of nonexclusive, nondispositive factors that a court may consider

in acting as evidentiary gatekeeper. *See Daubert*, 509 U.S. at 593–94. Nevertheless, Plaintiff

presents no arguments concerning any of the other factors espoused in *Daubert* or its progeny.

(*See* Pl.'s Br.; Pl.'s Resp.) Were Dr. Kelly's opinions based exclusively upon the SAC test,

Plaintiff's argument might carry some weight. However, this court's review of Dr. Kelly's

opinions suggests that the SAC evidence was but one small aspect of a much broader medical investigation.  (*See* Def. Action's Resp., Ex. A–1 [Kelly Report].)

"[T]he trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system: 'Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'"  *United States v. 14.38 Acres of Land*, 80 F.3d 1074, 1078 (5th Cir. 1996) (quoting *Daubert*, 509 U.S. at 596).  Should this matter proceed to trial, Plaintiff will be free to cross examine the doctor regarding the precise extent to which his ultimate conclusions are based on his reliance on the SAC test.

B.  Neuropsychological Testimony — Plaintiff's second argument is slightly more availing: Plaintiff complains that Dr. Kelly, who is not a neuropsychologist, gave "lengthy criticisms in his deposition concerning [Plaintiff's neuropsychologist's] report, testing[,] and []findings," which were beyond the scope of his expertise.  (Pl.'s Br. at 6.)  In response, Defendant argues that Plaintiff "conveniently ignores" the fact that Plaintiff's counsel asked Dr. Kelly a deposition question concerning her neuropsychologist's report, thus "opening the door" for further questioning by defense counsel on the report.  (Def. Action's Resp. at 5–6.)

In deposition, Plaintiff's counsel noted that Dr. Kelly had affixed a note to Plaintiff's neuropsychologist's report stating that the doctor "did not test for depression."  (Pl.'s Reply, Ex. 1 at 30 [Kelly Dep.].)  Other than asking Dr. Kelly if he wrote the note, it appears that Plaintiff's counsel did not enquire further into Dr. Kelly's evaluation of this report.  (*See id.*)  Nevertheless, it appears defense counsel saw this question as one that "opened the door" to a series of questions

eliciting extensive testimony from Dr. Kelly concerning Plaintiff's neuropsychologist's report. (*See* Pl.'s Br., Ex. 2 at 106–113 [Kelly Dep.].)   In the deposition, however, Dr. Kelly stated, "I don't call myself a neuropsychologist because I'm not [one]" and further admitted he is not qualified as an expert to administer or interpret the results of neuropsychological testing in a legal setting.   (*See id.*)   Consequently, to the extent Dr. Kelly's opinions touched upon matters beyond his area of expertise, they will be excluded at trial.

### (2)   *Dr. Reilly*

Plaintiff attacks Dr. Reilly's conclusion that mild traumatic brain injuries resolve within six months as unfounded because the doctor did not cite "any proper authority supporting it."   (*Id.* at 6.)   Specifically, Plaintiff contends that Dr. Reilly based his opinion on: (1) one study that does not support the conclusion; and (2) another study that lacks merit because "the undersigned [counsel] *could not find [it]*."   (*Id.* at 6–7 [emphasis added].)   Thus, concludes Plaintiff, "it *appears* that Dr. Reilly's reliance on these articles is, at best, misplaced and is not a legitimate authoritative source for his conclusions."   (*Id.* at 7 [emphasis added].)   In light of the monumental frivolity of this abusive and patently unwarranted line of argument, the court need not reference Defendant's arguments in response.

Plaintiff fails to cite any authority supporting the extraordinarily daft proposition that expert opinions ought to be stricken "where it *appears*" — based upon counsel's inept discovery

and incomplete research — that the opinions are not based in or supported by any scientific theory.[5]   As such, the court rejects Plaintiff's argument.

Plaintiff's counsel can rest assured this court will scour future submissions for further frivolity and will not hesitate to issue a Rule 11 show-cause order if it catches even the slightest whiff of a repeat offense.  *See* Fed. R. Civ. P. 11(b) (2007); *see also* Colo. R. of Prof'l Resp. 3.1 (2006) ("A lawyer shall not . . . assert or controvert an issue . . . *unless there is a basis for doing so that is not frivolous*.") (emphasis added).

**4.      Conclusion**

Based on the foregoing it is therefore ORDERED that:

1.      DEFENDANT ACTION's motion (#104) for partial summary judgment is GRANTED.  The final judgment entered in this case shall reflect entry of judgment in favor of Defendant Action and against Plaintiff on Plaintiff's third, sixth, and ninth claims for relief, dismissing those claims with prejudice.

2.      DEFENDANT ACTION's motion (#107) for summary judgment is GRANTED. The final judgment entered in this case shall reflect entry of judgment in favor of Defendant Action and against Defendants Clark and Depot Sales, dismissing their cross claims with prejudice.

---

[5]A party's failure to cite any authority "suggests either that there is no authority to sustain its position or that it expects the court to do its research."  *Rapid Transit Lines, Inc. v. Wichita Developers, Inc*., 435 F.2d 850, 852 (10th Cir. 1970).

3.     PLAINTIFF's motion (#109) to exclude expert testimony is GRANTED in part and is otherwise resoundingly DENIED.  Dr. Kelly shall not testify regarding matters beyond his area of expertise.

The court will hold a Final Pretrial Conference commencing at 4:15 o'clock p.m. on Friday, August 3, 2007, in Courtroom A201 of the Alfred A. Arraj United States Courthouse, 901 19th Street, Denver, Colorado.  In preparing for and participating in the conference, the parties and counsel will (1) follow the Instructions for Preparation and Submission of Final Pretrial Order, a copy of which can be downloaded from the court's web site, specifically http://www.cod.uscourts.gov/forms/ewn_fin_pre_ord_ins.pdf, and (2) utilize the specific template located at http://www.cod.uscourts.gov/forms/ewn_fin_pre_ord.wpd.  These specific web addresses should be used to insure that the proper format is observed.

Dated this 9th day of July, 2007.

BY THE COURT:


s/ Edward W. Nottingham
EDWARD W. NOTTINGHAM
Chief United States District Judge